NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 17, 2015
Decided December 10, 2015

**Before**

JOEL M. FLAUM, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 15-1923

| | |
|---|---|
| PATRICIA A. SHUMAKER, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Indiana, Fort Wayne Division. |
| *v.* | |
| | No. 1:13cv268 |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of Social Security, | Joseph S. Van Bokkelen, |
| *Defendant-Appellee*. | *Judge*. |

**ORDER**

Patricia Shumaker applied for Disability Insurance Benefits claiming to be disabled by injuries from a motorcycle accident along with depression, anxiety, and borderline intellectual functioning. An administrative law judge disbelieved her testimony that these conditions were disabling and concluded that she retained the residual functional capacity to perform light work with certain limitations. Shumaker challenges this adverse credibility finding and the ALJ's assessment of her residual functional capacity. We conclude that substantial evidence supports the ALJ's decision.

Shumaker, who is currently 51 years old, has a long work history that includes positions in factories and as a housecleaner in a nursing home. But she was thrown from a motorcycle in July 2008 and fractured the top of her right humerus, her right shoulder and collarbone, and a toe. Since then she has worked only a few months. In January 2011 she applied for disability benefits and alleged an onset date in June 2009, when she last was employed. She identified four impairments: right shoulder injury, depression, anxiety, and limited reading and writing skills.

Shumaker's accident prompted three shoulder surgeries and months of occupational therapy. During the first surgery, four months after the accident, a plate secured with screws was inserted into her shoulder. Two months later the doctor released Shumaker to return to work without restriction and suggested that she take ibuprofen for residual pain. Shumaker returned to her job as a housecleaner at the nursing home, but in May 2009, six months after that first surgery, she still was reporting severe shoulder pain as well as numbness in her arm. An MRI revealed a slight bulging disc in her back but no issue with her neck. Shumaker's doctor was skeptical that he could do more for her and referred her to John Pritchard, a sports medicine doctor.

Shumaker met with Dr. Pritchard a few days later in June 2009, and he ordered a CT scan and electromyogram. The EMG was normal, and the CT scan confirmed that Shumaker's bone fractures had healed properly, though "mild" to "moderate" degenerative changes were detected in her right shoulder joints. The following month Pritchard operated on that shoulder to fix a torn rotator cuff. At a follow-up exam 6 weeks later, Shumaker rated her pain as 1 or 2 out of 10. Pritchard prescribed Vicodin and a muscle relaxant for spasms and opined that Shumaker was doing well. The range of motion in her shoulder continued to improve with occupational therapy, and by January 2010, 18 months after the motorcycle accident and 6 months after Shumaker's rotator cuff surgery, her collarbone fracture was healed completely. Shumaker still complained of tenderness over the collarbone plate, which prompted Pritchard to remove the plate in February 2010. He last treated Shumaker in March 2010, opining then that her shoulder fracture was healed and in "good stead." He recommended that Shumaker avoid jobs involving significant overhead lifting and noted that in future years Shumaker's risk of arthritis in the injured shoulder would increase slightly.

In January 2011, two days before Shumaker applied for benefits, Dr. Pritchard opined that Shumaker had a 5% impairment of her upper arm and a 3% impairment "of the whole person." These numbers, he said, were based on guidelines published by the American Medical Association, *see* LINDA COCCHIARELLA & GUNNAR B.J. ANDERSSON,

AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT (5th ed. 2001). He noted that he had no plans for further treatment.

The next month Shumaker was examined by two state-agency consultants, Dr. David Ringel, an osteopathic physician, and Dr. Michael Scherbinski, a psychologist. Ringel reported that Shumaker had limited motion and weakness in her right shoulder and was unable to lift her arm above her head. Shumaker also told Ringel that she was having difficulty getting dressed, but the physician observed that she was able to dress and undress without difficulty during the examination. He also noted that her gait was normal and that she was able to rise from her chair, climb on and off the examination table, squat, and walk on her heels and toes without difficulty. Scherbinski administered a mental examination from which he concluded that Shumaker's intellectual functioning was generally below average but still adequate to maintain employment. He noted, though, that she might have difficulty consistently meeting demands in a work environment because of her physical and mental-health issues.

In March and May 2011 two doctors performed "independent medical examinations," apparently in connection with a state-court lawsuit. *See* IND. R. TRIAL P. 35 (permitting civil parties to move, upon good cause shown, for court order directing that opposing party submit to physical examination if physical condition is in controversy). Doctor Thomas Lazoff (who specializes in physical medicine and rehabilitation and pain medicine) examined Shumaker first. She complained of pain in her right shoulder and upper arm, numbness in her right forearm, occasional headaches, back pain, and neck pain. She rated her overall pain as 4 out of 10 on a good day and 8 on a bad day, and reported taking Vicodin, Tylenol, and ibuprofen, and using ice and heating pads to control the pain. Lazoff concurred with Dr. Pritchard that little more could be done from a treatment perspective. Doctor Mark Reecer then examined Shumaker. He did not detect signs of symptom magnification and opined that Shumaker's complaints of pain and restricted movement were consistent with her injuries. He also opined that she likely would experience permanent chronic pain in her right shoulder and never be able to lift her right arm above shoulder level. He did not anticipate a need for further treatment and concluded that her arm was impaired by 23%, which, he added, was equivalent to a 14% "whole person" impairment.

The Social Security Administration initially denied Shumaker's application in February 2011, and did so again on reconsideration in March 2011. One year later, in March 2012, Shumaker testified before the ALJ. Since the motorcycle accident, she explained, her use of her right arm had been limited. She was always in pain, although

nonprescription medication, ice, and heat had provided some relief. The toe she broke in the motorcycle accident, Shumaker continued, causes pain when she squats, stands on her toes, climbs or descends stairs, and walks barefoot. Twice monthly, on average, she experiences headaches that can last a few hours or the entire day. And, she added, she always has struggled with memory and concentration, and now has nightmares that, along with arm pain, prevent her from sleeping more than two or three hours each night.

Shumaker also described her daily activities, which include watching television, talking on the phone, playing computer games, sewing, visiting or shopping with her two adult children, straightening the house, loading the dishwasher, and gardening. But usually, she insisted, she struggles to get out of bed and relies on her husband to make breakfast, vacuum, mop, clean the shower, push the grocery cart, and even help her dress and brush her hair. She enjoys camping with her family, she added, although she stays in a camper and spends most of the time seated.

A vocational expert was asked to comment on the job prospects for a claimant with the following residual functional and mental capacity: able to lift 10 pounds frequently and 20 pounds occasionally; capable of sitting, standing, or walking for 6 hours in an 8-hour workday; able to occasionally balance, stoop, kneel, crouch, climb ramps or stairs but not crawl or climb ladders, ropes or scaffolds; able to frequently use the right arm for gross manipulation and occasionally to reach or pull levers or controls; not able to cope with hazards including moving machinery, unprotected heights, and slippery or uneven surfaces; unable to understand, remember, or carry out detailed instructions; not capable of performing tasks that require frequent decision-making; and unable to tolerate sudden or unpredictable changes in the work place. Such a person, the VE said, could not perform Shumaker's past jobs but still could work. That would still be true, the VE continued, if the claimant was further limited (as her lawyer asserted) to sedentary work involving simple and routine tasks and requiring only occasional reaching (and no overhead reaching) with the right arm, only occasional handling with the right hand, and only incidental contact with supervisors, coworkers, and the general public.

The ALJ applied the 5-step analysis for assessing disability, *see* 20 C.F.R. § 404.1520(a)(4), and first determined at Step 1 that Shumaker had not engaged in substantial gainful activity since her alleged onset in June 2009.

At Step 2 the ALJ identified Shumaker's severe impairments as mild depression, generalized anxiety disorder, borderline intellectual functioning, past fractures of the

right clavicle and scapula, obesity, and "disorder of the right foot." The ALJ concluded, however, that Shumaker's neck pain and headaches were not severe because the MRI of her neck had been "relatively unremarkable," her headaches occur only occasionally, and no doctor had mentioned any limitations caused by these conditions. At Step 3 the ALJ concluded that Shumaker's impairments, individually or in combination, do not satisfy a listing for a presumptive disability.

At Step 4 the ALJ rejected as not credible Shumaker's account of the extent of her limitations. The ALJ started with boilerplate language reciting that, although Shumaker's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects" of those symptoms "are not credible to the extent they are inconsistent with" the ALJ's assessment of Shumaker's residual functioning capacity. The ALJ then discounted Shumaker's testimony for several reasons: The medical record does not substantiate her account of her limitations, she had received unemployment benefits after her alleged onset date, she had described daily activities that are inconsistent with her alleged impairments, her medical treatment in the year preceding the decision had been limited, and she had presented "generally unpersuasive appearance and demeanor while testifying at the hearing."

The ALJ gave "significant weight" to the medical opinion of Shumaker's treating physician, Dr. Pritchard, who suggested that her shoulder impairment and back pain did not preclude her from working. The ALJ also gave significant weight to the state-agency medical and psychological consultants who had opined that Shumaker could perform unskilled light work. Finally, the ALJ gave moderate weight to the opinions of the two doctors who had examined Shumaker in relation to the state-court lawsuit, neither of whom suggested that Shumaker was unable to work.

At Step 5 the ALJ concluded that Shumaker no longer could perform her past jobs but could engage in light work with some limitations.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner, *see Pepper v. Colvin*, 712 F.3d 351, 361 (7th Cir. 2013), and a district judge upheld the ALJ's decision.

On appeal Shumaker challenges the adverse credibility finding, arguing that the ALJ improperly discounted her testimony of her right-arm limitations. But the ALJ's finding that Shumaker had exaggerated the extent of her limitations is supported by

substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (giving ALJ's credibility finding "special deference" and explaining that reversal is warranted only if finding is "patently wrong"). None of the doctors who examined Shumaker—including her treating physician, Dr. Pritchard—concluded that she is completely unable to use her arm. *See* 20 C.F.R. § 404.1529(c)(2) (explaining that agency will consider objective medical evidence in evaluating severity of claimant's symptoms). Pritchard opined that Shumaker's use of her right arm is impaired only 5%, Dr. Lazoff observed a slight decrease in range of motion and some tenderness over her collarbone, and even Dr. Reecer, whose opinion is most favorable to Shumaker, thought that her right arm was impaired only 23% (though he added that she is permanently unable to lift or reach above the shoulder). Moreover, Shumaker testified that she tends to her flower garden, sews, washes dishes, and folds towels, which the ALJ thought to be tasks unlikely to be performed by someone limited to using one arm.

Shumaker insists that this reference to her daily activities is improper. As Shumaker notes, we have criticized ALJs repeatedly for equating activities of daily living with an ability to engage in full-time work. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010). But that is not what the ALJ did. Rather, the ALJ evaluated Shumaker's daily activities against her asserted impairments in assessing whether she was exaggerating the effects of her impairments. *See* 20 C.F.R. § 404.1529(c)(3)(i) (explaining that agency will consider daily activities in evaluating severity of claimant's symptoms); SSR 96-7P, 1996 WL 374186, at *3 (directing ALJ to consider daily activities in determining credibility of claimant's statements about symptoms); *Pepper*, 712 F.3d at 369 (agreeing with ALJ's reasoning that claimant's daily activities undermined her testimony about extent of her symptoms); *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012).

Shumaker also suggests that the ALJ should have found her credible because of her arduous work history before the motorcycle accident. A "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Hill v. Colvin*, No. 15-1230, 2015 WL 7785561, at *5 (7th Cir. 2015) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)); *see Singletary v. Sec'y of Health, Educ. & Welfare*, 623 F.2d 217, 219 (2d Cir. 1980) (explaining that claimant's history of performing demanding work over long hours "justifies the inference that when he stopped working he did so for the reasons he testified to"); *Allen v. Califano*, 613 F.2d 139, 147 (6th Cir. 1980) (claimant's significant work history "demonstrated a considerable inclination toward employment"). But work history is just one factor among many, and it is not dispositive. *See Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). And here the

ALJ's silence is not enough to negate the substantial evidence supporting the adverse credibility finding.

Shumaker further notes that the ALJ, in finding her not credible, repeated language that we have criticized as "meaningless boilerplate." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *see Bjornson*, 671 F.3d at 644–45; *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011). But the use of boilerplate is not a ground to remand where, as here, the ALJ has otherwise provided information that justifies her credibility determination. *See Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Pepper*, 712 F.3d at 367–68. And if the ALJ adequately explains her decision despite the boilerplate, this court has no reason to expand on the ALJ's analysis.

Shumaker further asserts in a footnote that five of the ALJ's stated reasons for finding her testimony not credible are either vague or missing a "logical bridge": (1) the medical record as a whole does not support Shumaker's alleged limitations, (2) her daily activities are not limited to the extent one would expect, given her complaints of disabling pain, (3) she received unemployment benefits after the alleged onset date, (4) her medical treatment had ended a year before the ALJ's decision, and (5) her appearance and demeanor at the hearing undermined her credibility. These assertions are not developed, *see Massuda v. Panda Express, Inc.*, 759 F.3d 779, 783 (7th Cir. 2014) (noting lack of development was reason enough to reject plaintiff's contention); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."), and neither did Shumaker raise them in the district court, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (rejecting as waived arguments not raised in the district court); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) ("[I]ssues that are not raised before the district court are waived on appeal."). Thus, they are waived.

Shumaker also contends that the ALJ's assessment of her residual functional capacity fails to adequately account for all of her impairments, including her obesity and the pain in her neck, back, and hips. But the ALJ *did* consider Shumaker's obesity, concluded that it was a severe impairment, and analyzed the effect of that impairment on her residual functional capacity by referencing the Social Security Administration's guidance for obesity. *See* SSR 02-1P, 2002 WL 34686281. The ALJ incorporated several of the limitations described in SSR 02-1P into Shumaker's residual functional capacity, including limitations on balancing, stooping, crouching, climbing ramps and stairs, and handling hazards. *See id.* Moreover, Shumaker does not identify any evidence in the

record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments. Thus, even if the ALJ had erred in considering how Shumaker's obesity affects her ability to work, that error would be harmless. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

As for Shumaker's neck, back, and hip pain, the record does not support her contention that she was limited by this pain. She did not testify about pain in her neck, back, or hips at the hearing, and Dr. Lazoff, one of the doctors who evaluated her for the state-court lawsuit, reviewed the MRI of Shumaker's spine and concluded that it was unremarkable. Dr. Ringel, the state-agency osteopathic consultant, did note back spasms and "range of motion deficits" in Shumaker's neck, lower back, and hips, but this assessment says nothing about pain. Although an ALJ must consider all of the relevant evidence in the record in assessing the claimant's residual functional capacity, the ALJ need not discuss each piece of evidence in her written decision. *Murphy*, 759 F.3d at 817–18; *Pepper*, 712 F.3d at 362; *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011). The ALJ said enough in this instance to satisfy us that substantial evidence supports the assessment of Shumaker's residual functional capacity.

We thus AFFIRM the judgment of the district court.